```
 1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                            EASTERN DIVISION

 3

 4   SHCOREY ROSS                                          PLAINTIFF

 5   VERSUS                      CIVIL ACTION NO. 2:22-cv-00094-RPM

 6   TODD KEMP, ET AL.                                    DEFENDANTS

 7

 8

 9                         OMNIBUS PROCEEDINGS
                  BEFORE THE HONORABLE ROBERT P. MYERS,
                    UNITED STATES MAGISTRATE JUDGE,
10                         FEBRUARY 23, 2023,
                          JACKSON, MISSISSIPPI
11

12

13

14   APPEARANCES:

15   FOR THE PLAINTIFF:     SHCOREY ROSS (PRO SE)

16

17   FOR THE DEFENDANTS:    KEVIN J. WHITE, ESQ.

18

19

20

21

22   REPORTED BY:

23       CAROLINE MORGAN, CCR #1957
         OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4188
25       E-mail:  Caroline_Morgan@mssd.uscourts.gov
```



EXHIBIT
A

1

## TABLE OF CONTENTS

2    Style and appearances....................................  1

3    WITNESS:  SHCOREY ROSS

4    Examination by the Court.................................  8

5    Examination by Mr. White ................................ 60

6    Continued examination by the Court....................... 72

7    Court Reporter's Certificate............................. 80

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                **IN OPEN COURT, FEBRUARY 23, 2023**

2

3        THE COURT:  Good afternoon.  Please be seated.  All

4    right.  We are here in the matter of Ross v. Todd Kemp, et

5    al., Cause Number 2:22-cv-94.  This is set for an omnibus

6    hearing or a screening hearing.  You are Mr. Ross; is that

7    correct?

8        MR. ROSS:  Yes, sir.

9        THE COURT:  Good afternoon, Mr. Ross.  Is your

10   microphone on?  Do you have a green light on on the bottom?

11       MR. ROSS:  Yes, sir.

12       THE COURT:  All right.  You might just want to pull it

13   up just a bit little closer to you, so I can make sure that

14   we get you on the recording device, Mr. Ross.  They're going

15   to provide you some assistance.  There you go.

16       Okay.  Counsel for the defendant, would you please

17   identify yourself for the record, along with your clients?

18       MR. WHITE:  Yes, Judge.  Good afternoon.  I'm Kevin

19   White, with the Allen Allen Breeland & Allen firm in

20   Brookhaven, Mississippi, and we represent the named

21   defendants, those being Todd Kemp, James Mosely, and Barry

22   White.

23       THE COURT:  All right.  Thank you, sir.

24       All right.  Mr. Ross, I have asked you to join us here

25   this afternoon as a result of a lawsuit you have filed, and

1    we are going to go over your entire lawsuit, so rest easy.

2    Have you ever been to a screening hearing or a *Spears*

3    hearing such as this before?

4        MR. ROSS:  No, sir.

5        THE COURT:  Okay.  Well, first of all, you're

6    proceeding without payment of cost, and that's what called

7    IFP, or in forma pauperis.  And you've requested to proceed

8    that way, and that's been granted to you by the Court.

9        That makes your case fall under the Prison Litigation

10   Reform Act, and in the first instance, requires the Court to

11   screen your case.  And by screening it, the statute is a

12   little broad.  We are supposed to determine whether or not

13   you have stated a claim under which any relief can be

14   granted and whether or not your claim has at least an

15   arguable basis in fact and an arguable basis in the law.

16       Now, you can have facts that are absolutely correct,

17   but they still may not met the legal standards of

18   42 USC Section 1983.  Or conversely, you may not have enough

19   facts, but you have got the law on your side.  In order to

20   proceed with your case, you have to have the facts and the

21   law.  Are you with me?

22       MR. ROSS:  Yes, sir.

23       THE COURT:  All right.  And that's part of what we're

24   trying to determine here today.  Now, in order to screen

25   your case, I first consider all of your complaints that you

1   have filed, but sometimes the complaints aren't absolutely

2   clear.  And so what I like to do is bring the plaintiff,

3   such as yourself, in open court and give you the opportunity

4   to tell me in your own words what your lawsuit is about,

5   what each defendant has to do with it, and how you believe

6   each defendant has violated your Constitutional Rights.

7       I'll listen to what you have to say, and I take that

8   into consideration, along with your complaint, and then I

9   come up with a conclusion as to whether or not your case has

10  at least an arguable basis in fact and an arguable basis in

11  the law.

12      Now, we're also going to talk about some procedural

13  aspects of your case, some things that you may or may not be

14  aware of.  And since I'm required to consider what you have

15  to say as a supplement to your complaint, but not an actual

16  amendment to your complaint, then what you tell me should be

17  under oath.  So at this time, Mr. Ross, I want you to stand

18  up, raise your right hand, and take the oath from the

19  courtroom deputy.

20      *(Whereupon, the witness was placed under oath.)*

21      THE COURT:  All right.  Go ahead and have a seat.

22      Now, first, you got a decision to make.  You have the

23  option to choose whether you want to have the district judge

24  hear your case or whether you want to have the magistrate

25  judge hear your case.  And insofar as you are concerned,

1    there is really no difference between the two judges.  The

2    same procedure is going to be used.  The rules of evidence

3    will be the same.  The right of appeal will be the same.

4    Everything is the same right down the line, with the only

5    possible exception being that the magistrate judge may get

6    to your case a little more quickly than the district judge

7    due to case loads.

8        I am the magistrate judge assigned to your case, and

9    Judge McNeel is the district judge assigned to your case.  I

10   can assure you it makes no difference to Judge McNeel who

11   the judge is going to be, and likewise, it makes no

12   difference to me who the judge is going be.  We both have

13   plenty of cases to do and lots of work, and so you are not

14   going to anger either one of us depending on which one you

15   choose.  It will not adversely affect your case either way.

16   Do you have any questions about the consent process,

17   Mr. Ross?

18        MR. ROSS:  No, sir.

19        THE COURT:  Okay.  Now, we got to have a written form

20   if you are going to consent.  What do you want to do?  Do

21   you want to have Judge McNeel, the district judge, hear your

22   case?  Or do you want to have me as the magistrate judge

23   hear your case, Mr. Ross?

24        MR. ROSS:  I choose you, sir.

25        THE COURT:  All right.  And that's fine.  And so the

1    law gives you that option and says that the consent has to

2    be in writing, as I just mentioned.  And so we have a form

3    for that for you to use.  I want you to go ahead and she is

4    going to provide you with the form.  I want you to look over

5    the form, make sure you understand it.  But it simply means

6    that you've consented to have your case tried by the United

7    States Magistrate Judge today.

8         MR. ROSS:  Okay.

9         THE COURT:  And by consenting to a magistrate judge,

10   you're not giving up any rights.  And I want you to read it

11   and want you to sign it.  And you're stating that you have

12   read it and you understand the consent form.  Thank you,

13   Mr. Ross.

14        Mr. White, the defendants, will they consent, or do

15   they want the district judge?

16        MR. WHITE:  Judge, we consent.

17        THE COURT:  Okay.  I need you to sign the consent as

18   well, please.  Thank you.

19        All right.  Mr. Ross, now I've looked over your

20   complaint, but I'm hoping you can save us some time by

21   telling me in your own words what your lawsuit is about and

22   how you believe these particular defendants were involved.

23        In other words, how you feel they violated your

24   Constitutional Rights.  Now, you don't need have to name

25   each specific constitutional rights, but I want you to tell

1    me in your own words, beginning to end, what your lawsuit is

2    about, how you believe they violated your rights, who they

3    were, when these supposed violations occurred, and I'm

4    probably going to interrupt you from time to time and ask

5    you some questions.  Okay?

6         MR. ROSS:  Yes, sir.

7         THE COURT:  Now, after I get through asking questions,

8    Mr. White, on behalf of the defendants, may have some

9    questions as well, and I want you to extend to him the same

10   courtesy that you're going to extend to me.  All right?

11        MR. ROSS:  Yes, sir.

12                        **SCHOREY ROSS,**

13         having been first duly sworn, was examined and

14   testified, as follows...

15                        **EXAMINATION**

16   **BY THE COURT:**

17   Q.  But before we get into the omnibus hearing of sorts, you

18   have filed a TRO motion, temporary restraining order motion.

19   Do you remember that?

20   A.  Yes, sir.

21   Q.  And from me looking at the file, you filed that motion

22   for TRO on August 8th of '22?

23   A.  Yes, sir.

24   Q.  And as I appreciate it, and you correct me if I'm wrong,

25   the reason that you filed the TRO motion was because you were

1   in fear for your life.  Is that a fair statement?

2   A.   Yes, sir.

3   Q.   Was there any other reason that you filed the TRO?

4   A.   No, sir.

5   Q.   And so that I'm clear in my mind, and you listen to me

6   carefully and make sure that I am correct, are you asking the

7   Court to fashion some relief, so that you are no longer fear

8   for your life at the facility?

9   A.   I really just want to be moved to another facility or

10  either what you said, sir.

11  Q.   Okay.  That's the relief that you want?  To move to a

12  different facility or to try and fashion some relief, so that

13  you are not longer in fear for your life?

14  A.   Yes, sir.

15  Q.   And where are you currently housed?

16  A.   Clarke County Jail.

17  Q.   And is that where you say you are in fear of your life?

18  A.   Yes, sir.

19  Q.   Okay.  Now, is there any other basis for your TRO motion,

20  other than what we have talked about?

21  A.   The relief to be granted, can you explain what that

22  means, sir?

23  Q.   Sure.  What are you asking me to do?  I think you're

24  asking me to move you to a different facility or to fashion

25  some relief, take some action, enter some order, so that you

1   are not in fear of your life at the Clarke County facility?

2   A.   Yes, sir.

3   Q.   Is there any other reason you filed the TRO?

4   A.   No, sir.

5   Q.   Okay.  And so I know you've gotten a copy of my order

6   that I entered on February the 1st of 2023 talking about these

7   proceedings and the four elements.  Do you remember that?

8   A.   Yes, sir.

9   Q.   Okay.  Let's start off with some basic questions.  And

10  it's an open-ended question.  Why are you in fear for your

11  life since you filed the TRO?

12  A.   Because on May 10th, 2022, Barry White came into my cell,

13  and he tased me while I was locked and contained behind the

14  cell gate.  I was not imposing a threat to him nor was I

15  imposing a threat to myself.  How can I be imposing a threat

16  to anyone if I'm locked behind my cell gate?  Which I went

17  behind my cell gate willingly.

18  Q.   Okay.  Any other reasons in addition to that being tased

19  by Barry White on May the 10th of 2022 that caused you to file

20  the TRO?

21  A.   On May 10, 2022, I was also placed in the hole by Barry

22  White after being tased, which I walked willingly to the hole

23  and was maced numerous times.  The time period prior, I'm not

24  really sure about, but I was never took to see medical to get

25  the prongs removed out my body when I was tased, nor was I

1  ever took to see medical after I was maced.

2      I have eczema, and that damaged my skin very bad.  It

3  took me a while -- it took me a while to actually get my skin

4  healed.  They had to present me with eczema creams and all

5  such of things.

6  Q.  Okay.  And so I want to make sure -- you got placed in

7  the hole on May 10th of 2022?

8  A.  Yes, sir.

9  Q.  And they wouldn't let you go to medical to remove the

10 prongs?

11 A.  No, sir.  They snatched them out.

12 Q.  Okay.  And you got maced as well?

13 A.  Yes, sir, while I was in the hole.  I was locked and

14 contained in the hole.

15 Q.  And you have eczema?

16 A.  Yes, sir.

17 Q.  And this mace -- you believe you should have been

18 decontaminated due to your eczema and the mace?

19 A.  Yes, sir.  Also, on May 26th, 2022, I was also tased by

20 James Mosely while I was locked and contained behind the cell

21 gate.  I was not a threat to him, nor was I a threat to myself

22 if I'm locked and contained behind the cell gate.

23 Q.  All right.  So you have told me about the tasing, a

24 macing, and another tasing.  Any other basis for filing your

25 TRO?

1    A.   Yes, sir.  On the way to the hole on May 10, 2022, Barry
2    White told me I deserved to be shot and killed.
3    Q.   All right.  Anything else?
4    A.   No, sir.
5    Q.   Okay.  So there was a tasing by Barry White on May the
6    10th of '22.  There was a macing on May the 10th of 2022.  Was
7    that also by Barry White?
8    A.   Yes, sir.
9    Q.   And that was in the hole.  And they didn't take you to
10   medical to remove the prongs from the TASER, and they didn't
11   take you to get decontaminated, and you have eczema?
12   A.   Yes, sir.  Also, sir, the reason why I also filed a
13   temporary restraining order, there is no 24-hour medical.  I
14   have seen other people in Clarke County Jail, such as a woman
15   named Kim Taylor, pass.  What if that was me that had a bad
16   reaction to the mace or anything and that would have been me
17   that passed?  How can they treat me if they have no medical?
18   Q.   All right.  And so in addition to that, Barry White told
19   you you deserved to be shot and killed --
20   A.   Yes, sir.
21   Q.   -- on the way to hole.  And that was also in conjunction
22   with the events of May the 10th of '22?
23   A.   Yes, sir.
24   Q.   And then on May the 26th, James Mosely, he tased you
25   while you were in your cell and no threat.  And then you told

1   me that you don't have access to 24-hour medical care at

2   Clarke County.  Anything else that you are claiming that gives

3   rise to your motion for TRO?  I want to make sure I hear it

4   all.  That's why I am asking.

5   A.   And also, it has been officers that tried to bribe other

6   inmates, which I had -- I wrote and I got their signatures of

7   the inmates that they tried to bribe to jump on me because of

8   this lawsuit.

9   Q.   All right.  Do you know the name of the officer or

10  officers that tried to bribe other inmates to jump you?

11  A.   Kenneth Hollifield.

12  Q.   Kenneth Hollifield.  When did that take place if you

13  know?

14  A.   I'm not really sure.  It was a past date.

15  Q.   Can you give me a date range?

16  A.   Previously.  The ending of -- this month is January, so

17  December -- last month around about in the middle of the

18  month.

19  Q.   All right.  So we are in February.  Are you telling me in

20  January?

21  A.   Yes, sir.

22  Q.   Of '23?

23  A.   Yes, sir.

24  Q.   Okay.  So you're telling me --

25  A.   Yeah '23.

1    Q.    In '23?

2    A.    Yes, sir.

3    Q.    So, like, within the last 30, 45 days?

4    A.    Yes, sir.

5    Q.    So you have Officer Hollifield attempted to bribe other

6    inmates to jump you and harm you?

7    A.    Yes, sir.

8    Q.    Anything else -- and we are going to go into each one of

9    these -- anything else that is the basis of your motion for

10   filing your TRO motion?

11   A.    No, sir.

12   Q.    So let's go -- well, first of all, let's back up and get

13   some background information from you.

14   A.    Yes, sir.

15   Q.    Give me your full name, Mr. Ross.

16   A.    Shcorey Lashaun (phonetically) Ross.

17   Q.    All right.  And, Mr. Ross, how old are you?

18   A.    I'm 19.

19   Q.    All right.  And why are you presently incarcerated in the

20   Clarke County Jail?

21   A.    I'm being tried for capital murder, but I have not been

22   indicted.

23   Q.    All right.  And so you are being tried for capital

24   murder, but you are awaiting indictment?

25   A.    Yes, sir.  This is my second indictment that I have

1    passed.

2    Q.   Okay.  So you would be a pretrial detainee is what you're

3    telling me?

4    A.   Yes, sir.

5    Q.   And have you been housed in the Clarke County Jail the

6    entire time?

7    A.   Yes, sir.

8    Q.   All right.  And you are not in MDOC custody then,

9    correct?

10   A.   No, sir.

11   Q.   Did you know Barry White prior to -- is he a deputy or

12   what?  Do you know?

13   A.   He's a -- I just met him recently since I been in jail.

14   But he holds many aspects within the jail.  He's a chief

15   deputy, jail administrator, and a chief of police in another

16   area.

17   Q.   So he is the chief deputy at the jail?

18   A.   Yes, sir.  And jail administrator.

19   Q.   Did you know Barry White before you were brought into the

20   jail?

21   A.   No, sir.

22   Q.   So is it correct for me to say then that the two of y'all

23   didn't have any dispute or beef prior to you getting in the

24   jail?

25   A.   No, sir.

1   Q.   Now, Officer Kenneth Hollifield, is he also a sheriff's

2   deputy?

3   A.   He's just a jailer.

4   Q.   Just a what?

5   A.   A jailer.  A CO.

6   Q.   Okay.  A jailer.  And did you know Mr. Hollifield prior

7   to arriving at the jail?

8   A.   No, sir.

9   Q.   And so likewise, is it fair for me to assume then that

10  you didn't have any ongoing dispute with Mr. Hollifield before

11  you got into the jail?

12  A.   No, sir.

13  Q.   So when were you placed -- when were you arrested and put

14  in the Clarke County Jail?  Do you remember?

15  A.   March 14 if I'm not mistaken.

16  Q.   March 14th of '22?

17  A.   Yes, sir.

18  Q.   So you were in there for approximately two months when

19  the first incident with Mr. White took place?

20  A.   Yes, sir.  I was housed -- I was housed around mental

21  patients each time it took place.  I really don't have a valid

22  witness.

23  Q.   Okay.  On this occasion on March -- on May the 10th of

24  2022, when you are alleging that Mr. White tased you while you

25  were in the cell and no threat to him, was anybody else in the

1  cell?

2  A.  Yes, sir.  James Mosely and Oscar Brewer (phonetically).

3  Oscar Brewer is an officer that no longer resides at the

4  Clarke County Jail.

5  Q.  Were they in the cell with you?

6  A.  They wasn't in the cell with me.  They was -- I was

7  locked behind the gate, and they was outside of the gate.

8  Q.  All right.  And I want you to listen to my question

9  carefully.  Okay?  Because I want to make sure you understand

10  it, and I understand you.  You said you were inside the cell

11  and Barry White was outside the cell, and you were not a

12  threat to Barry White, correct?

13  A.  Yes, sir.  I was contained behind a gate.

14  Q.  All right.  Who, if anyone, was on the other side of the

15  gate with you?

16  A.  No one.

17  Q.  Okay.  So you were there by yourself?

18  A.  Yes, sir.

19  Q.  Did they ask you to do anything or command you to do

20  anything before they tased you?

21  A.  No, sir.  They had commanded me to go behind my gate.

22  Which the first time they commanded me I said no, but the

23  second time he said, get behind the gate before I tase you,

24  which I did willingly.  Once I got behind the gate, the reason

25  of Barry White tasing me was because I called him the "B" word

1   I believe.

2   Q.   Called him the "B" word?

3   A.   Yes, sir.  He had called me a word before I called him

4   that, which was the same word.

5   Q.   All right.  And am I correct in assuming that they were

6   telling you to get behind the gate, because they wanted to

7   come in and cuff you to take you somewhere?

8   A.   No, sir.  They told me just to go behind the gate,

9   because I had earlier, previously, before they came and locked

10  me down, I was yelling down the hallway asking the officer why

11  was my visit taken.  And he wouldn't answer me, so I hit the

12  door trying to get his attention.  He told me he'll be back.

13  He got something for me.  And they placed me behind the gate.

14  Q.   So he asked you to get behind the gate, you didn't do it.

15  He asked you again, you got behind the gate --

16  A.   They locked it.

17  Q.   And then what happened?

18  A.   After that, I was -- after that, I turned my back.  Barry

19  White called me the "B" word, and I turned around and called

20  him the same word, turned my back.  And next thing I know, I

21  was feeling a tasing sensation to my back.

22  Q.   Where were you tased?

23  A.   In my back.

24  Q.   And how many prongs hit you if you know?

25  A.   Two if I'm not mistaken.

```
 1   Q.   And where in your back were you hit?
 2   A.   My lower back.
 3   Q.   Okay.  And what happened after that?
 4   A.   After he tased me, they opened the cell gate, and he
 5   asked me to go to the hole.  The door was already open where
 6   my -- you know, it's a cell gate, and there's another door.
 7   The door was already open.  James Mosely escorted me to the
 8   hole.  I went to the hole.  They put me in the hole and closed
 9   the door.  And as they put me in the hole and closed the door,
10   I was enraged, so I was yelling while I was in the hole.
11        He told me be quiet.  I refused to be quiet, because I'm
12   already contained behind -- I'm contained and locked behind
13   the hole door.  I told him "F" him.  He opened the flap and
14   maced me the first time.  When he maced me, it got in my eyes.
15   So I started hitting the door.  He came back, maced me again,
16   closed the flap, then I continued to beat on the door.  He
17   came back and maced me once again.  And it continued the same
18   way and over and over again.  It happened --
19   Q.   Barry White?
20   A.   Barry White.  I lost count after the third or fourth
21   time.
22   Q.   All right.  Now, when you say he opened the flap, can you
23   describe for me what you mean?
24   A.   It's a door, and it got, like, a little flap opening on
25   it.  It's like a little window where they can close it.
```

1  Q.   Can you slide a tray in?

2  A.   Yeah, slide a tray in.  But --

3  Q.   Is it a solid door everywhere but the flap?

4  A.   It's a solid door, even the flap, and there's a key you

5  can put on the side and open it and twist it and open the

6  flap.

7  Q.   And so that flap, it's a piece of metal as well?

8  A.   Yes, sir.

9  Q.   Is there a window in the door?

10  A.   No, sir.  That's the window.  The flap is the window, but

11  you can't see out of it.  You can't see in, and you can't see

12  out of it, unless you open the flap.

13  Q.   Okay.  And I'm asking, because I haven't seen it.  If you

14  can't see out of it because it's a solid door and the flap

15  apparently is a piece of metal, unless the flap is open, how

16  do you know that Barry White was the one to mace you?

17  A.   When he opened it, I saw his face.  I saw his glasses.

18  Q.   Okay.  All right.

19  A.   I saw him, and he wears glasses on a daily basis.  I saw

20  him, and he put his hand up inside the flap and maced.  He

21  maced me and maced all around in the cell -- well, not the

22  cell, the hole.

23  Q.   Was anybody in that area with you on the other side of

24  the door?

25  A.   No, sir.

1  Q.   You were in there by yourself?

2  A.   Yes, sir.

3  Q.   Okay.  And you're telling me that he was telling you to

4  be quiet, and you were saying words and hollering?

5  A.   Yes, sir.

6  Q.   And that's when you got tased three or four times -- I

7  mean, maced three or four times?

8  A.   Yes, sir.  Well, I also hit the door, too, the first time

9  he told me to be quiet.  Then he maced me, because I wouldn't

10 be quiet.  The second time, I was hitting the door.  That was

11 after I was maced the first time.  And the third time, it

12 continued with me hitting the door was the reason why he maced

13 me.

14 Q.   Okay.  And what happened after that?

15 A.   I stayed in the hole for about -- I'd say an hour after

16 being maced all of those times, then I was still yelling.

17 They brought a restraint chair and put me in a restraint

18 chair, which is a chair where I'm strapped down from my arms,

19 my arms to the chair -- my arms to the railing of the chair

20 and my shoulders and back to the chair and my legs.

21      And they put in there for an hour.  They was feeding.

22 They skipped me on feeding, and they went down the hallway,

23 let me out the cell -- they skipped me, went down the hallway.

24 They came back, rolled me out my cell to cell C-1, which I was

25 in when he tased me.

```
1          They let me out, gave me less than three minutes to wash

2     the mace off of me, three to five minutes, which really just

3     reactivated the mace, and it was burning.  And put me back in

4     my cell and locked me down.  It took me three to four days to

5     get the mace completely off of me, because it was -- stayed on

6     me so long.  It damaged me skin.

7     Q.  All right.  So when you were tased originally, what area,

8     what cell, what room were you in?

9     A.  Cell C-1.

10    Q.  All right.  And then they took you from there and put you

11    in a different area where you were maced; is that right?

12    A.  Yes, sir.

13    Q.  What area was that?

14    A.  That's the hole.  That's the drunk tank where they put

15    inmates at when they first come in.

16    Q.  Did you know why he moved you from your cell after he

17    tased you to the hole?

18    A.  No, sir, I really don't.  I never asked that question.  I

19    believe he moved me there to closer define me where he --

20    closer -- had me closer up there where he is or something.

21    Q.  To supervise you?

22    A.  To supervise me.  But after he tased me -- I wasn't

23    yelling after he tased me.  I wasn't cussing him out after he

24    tased me.  After he tased me, it really drained me.  So after

25    he tased me, I really had -- if there was any fight left up in
```

1   me, he took it.

2   Q.   Is there any water in the hole?

3   A.   No, sir.

4   Q.   There's no sink or anything?

5   A.   No, sir.  Just the hole in the floor.

6   Q.   And then there is water in your cell C-1?

7   A.   Yes, sir.  But it only produces cold water.

8   Q.   Okay.  You ever been maced before?

9   A.   No, sir.  Never been tased either.

10  Q.   Okay.  And so you used the water in your cell C-1 to wash

11  your face, get it out of your eyes and stuff, I suppose?

12  A.   Once they let me out the hole and put me back in my cell,

13  they let me take a shower, but they timed me.

14  Q.   All right.  And you had a shower in your cell?

15  A.   Yes, sir.

16  Q.   Okay.  All right.  And what, if anything, else happened

17  on May 10th that gives rise to your TRO?

18  A.   On the way to the hole, after he tased me, Barry White

19  told me I deserved to be shot and killed.

20  Q.   Okay.  And is that all of the events of May the 10th of

21  '22 that give rise to your TRO?

22  A.   Yes, sir.

23  Q.   Did you ever request to go to medical?

24  A.   There is no way for me to request.  When I asked him

25  about going to medical -- I asked him about medical.  He said

1   we'll have to find -- or we'll have to figure out something.

2   Q.   All right.  What time of the day did these events occur?

3   A.   This happened around about 2:00-ish to 4:00.

4   Q.   2:00 to 4:00 in the afternoon?

5   A.   Yeah, 2:00 to 4:00 in the afternoon.

6   Q.   Do you remember the day of the week?

7   A.   It was a Sunday if I'm not mistaken.

8   Q.   Okay.  So did you specifically ask, I need to go to

9   medical?

10  A.   Yes, sir.  I asked -- after they brought me to my cell, I

11  asked them as they were putting me in my cell.  I am mistaken

12  myself in saying no in the beginning.  But, yes, sir, I asked.

13  Barry White came back to my cell once they put me in the cell,

14  and I asked him about medical, but he said we gonna have to

15  figure something out and never came back.

16  Q.   Okay.  Do you know if on that Sunday afternoon they had

17  anybody in the jail, whether it be a nurse practitioner or a

18  medical doctor, available or on call?

19  A.   There is never a nurse practitioner or anyone on call.

20  Q.   And how do you know that, Mr. Ross?

21  A.   Because I have seen the woman named Kim Taylor pass that

22  was in the hole.  I was peeping out my flap.  A officer had to

23  give her CPR, because there wasn't no nurse there to give her

24  CPR, the officer that booked her in.

25  Q.   Have you ever received any medical care at the Clarke

1    County Jail?

2    A.   Only time you receive medical is on Thursdays, and that's

3    a man named Windal.  He come -- he come every Thursday --

4    well, not every Thursday certain.  Sometimes he's not able to

5    make it, but you have to put in a medical form on paper.

6    Q.   A medical request?

7    A.   Yes, sir.

8    Q.   All right.  And then I think you told me about all of the

9    events of May the 10th of '22, right?

10   A.   Yes, sir, that's May 10th what I was just previously

11   speaking on.

12   Q.   Right.  And so then we get to May the 26th, and I belive

13   you say that Officer Mosely or -- is he a sheriff's deputy?

14   A.   Yes, sir.

15   Q.   He --

16   A.   I don't think he's a sheriff's deputy.  I take that back,

17   sir.  I think he's just a jailer.  I said sheriff's deputy.

18   I'm sorry.

19   Q.   That's okay.  And so he tased you as well?

20   A.   Yes, sir.

21   Q.   What -- do you know what day of the week this was?

22   A.   No, sir.  But I know May -- I think it was May 26, around

23   26th or 25th or 22nd, somewhere around in there.

24   Q.   Do you remember about what time of day it was?

25   A.   It was after 4:00.

1  Q.   And where were you located at this time?

2  A.   I was leaving -- they removed me from the hole and placed

3  me back in my cell with a mental patient, which he is not in

4  the same room as me, but he is right next to me.

5  Q.   Okay.  And so this occurred when you were in your cell?

6  A.   Yes, sir.

7  Q.   Was that also C-1?

8  A.   No.  That was, if I'm not mistaken, D-1 or B-1.  It's one

9  or the other.

10  Q.   "D" as in dog and "B" as in boy?

11  A.   Yes, sir, it was one or the other.

12  Q.   You were in one or the other at the time you were tased?

13  A.   Yes, sir.

14  Q.   And tell me what happened then.

15  A.   I was in my cell.  They had just brought me back to my

16  cell from being in the hole, because I asked to go to the

17  hole, because I felt as if I wanted to commit suicide earlier.

18  They put me in the hole to monitor me.  And when they put in

19  the hole, the reason of them putting me in the hole because I

20  felt as I wanted to commit suicide.  They had me around a guy.

21  All he do is yell and threaten me, throw boo-boo around the

22  cell, and I have to clean it up.

23      So I asked to be placed in the hole to keep from having

24  to place, to defend myself from him, or he have to defend

25  himself from me.  They placed me in the hole at 4:00-ish.

1   They moved me from the hole about 4:00-ish.  I'd say 4:00-ish

2   or 5:00-ish.  They removed me from the hole and placed me back

3   in my cell.

4        James Mosely was the officer that placed me back in my

5   cell.  On the way -- before they got ready to place me back in

6   my cell, though, I was in the hole.  I didn't want to leave

7   the hole, because I told them I felt like committing suicide

8   thinking maybe they would seek better action and try to get me

9   better help and maybe place me in the restraint suit or

10  something and leave me in the hole, but that wasn't the case.

11       They came with TASERS and pointed them at me while I was

12  in the hole and told me to get up.  And I shedded tears

13  begging them, please, sir, I don't think I'm in my right mind

14  to be placed back in my cell.  So they continued, and they

15  made me go back to my cell.  I went back to my cell.

16       As I got in my cell, James Mosely closed the cell door,

17  and I was looking at James Mosely, and I was crying.  I asked

18  him, sir, I feel like committing suicide.  Can I please get

19  some help?  The dude that's right next to me in the cell, he's

20  a mental patient.  He was yelling and talking about some

21  inappropriate things.  And I'm steadily -- I'm steady telling

22  James Mosely, I have to deal with this, sir.  I can't -- I

23  can't live like this.  I feel like I'm about to commit

24  suicide.  I feel as if I want to commit suicide.

25       James Mosely further after that, he never said nothing.

1   He just looked me in my eyes and just kept shaking his head,

2   shaking his head.  I continued yelling, saying that, and he

3   got tired of me yelling.  He shot me with the TASER in my

4   chest on my left side.

5   Q.   You were yelling at him you wanted to stay in the hole,

6   because you felt like you might commit suicide?

7   A.   I was yelling at him, I was asking -- I wasn't yelling at

8   him about going back to the hole.  I was telling him I felt

9   like committing suicide.  This was once I got in my cell and

10  got locked down.

11  Q.   And he tased you?

12  A.   He tased me.

13  Q.   And where did the prongs from that tasing hit you on your

14  body?

15  A.   In my chest.

16  Q.   And you're motioning to your left side?

17  A.   Yes, sir.

18  Q.   Your left chest?

19  A.   Yes, sir.

20  Q.   All right.  And how many prongs hit you there?

21  A.   Two.

22  Q.   And what happened after that?

23  A.   After that, James Mosely tried to snatch the things out

24  of me, but the things came -- they didn't come all the way out

25  of me.  It just scratched me as it was coming out of me, and

 1    they fell on the floor.  When they fell on the floor, he

 2    walked off, he said, hand me another battery.  And I ran and

 3    hopped on my bed and closed the door.

 4    Q.  So the prongs came out of you, and they landed on the

 5    floor.  And you're telling me he went to get another battery,

 6    and that's when you got up on your bed?

 7    A.  Yes, sir.  He went to get another battery to tase me

 8    with, but they didn't come back.

 9    Q.  He didn't come back?

10    A.  No, sir.

11    Q.  And he didn't tase you?

12    A.  No, sir, not a second time.

13    Q.  And nobody was in this cell at this time, whether it was

14    B-1 or D-1?

15    A.  It was a dude up in the cell with me named Gregory Jerome

16    Ragsdale.  If I'm not mistaken, that's his name, but he is a

17    mental patient.

18    Q.  He wasn't in the cell with you, he was in an adjoining

19    cell, I think is what you told me?

20    A.  Yes, sir, he was in an adjoining cell.

21    Q.  So there was nobody in the cell with you at the time you

22    were tased?

23    A.  No, sir.  I'm sorry.  I understood that wrong.

24    Q.  That's okay.  Anything else that you need to tell me

25    about the tasing incident by Jailer Mosely on May 26th of '22?

1    A.    I was never took to see medical about the incident either

2    about the prongs that went in my body.  If I'm not mistaken,

3    each time an inmate is tased, they supposed to take them to

4    see medical to remove the prongs properly, because if you pull

5    them out, if I'm not mistaken, they can damage a nerve or

6    something, right?

7    Q.    And what's the basis of your giving me that opinion?  I

8    don't know.  That's why I am asking.

9    A.    My basis of giving that opinion is because that's the

10   reason why I filed the TRO, because hopefully that don't have

11   to happen to me again.

12   Q.    Well, you indicated that there was a policy or a

13   practice, I think is what you were saying, that you were

14   supposed to go to medical each time you are tased or when you

15   are tased.

16   A.    I'm not sure if that's what is supposed to happen, but I

17   believe that's what supposed to happen.  That's my assumption.

18   Q.    But you don't have a document or a policy or somebody

19   hasn't told you that?  You're just thinking that's what it is?

20   A.    I'm thinking.  They don't hand us jail handbooks.  I know

21   no rules of the jail.  I have learnt as I went, as I go.

22   Q.    Did you ask anyone to see medical that day on May 26th of

23   '22 as a result of this tasing?

24   A.    After I was tased, it happened so fast.  He just walked

25   off.  I didn't get a chance to ask.

1  Q.   Were there -- other than the mental patient as you recall

2  and Jailer Mosely and yourself, was there anybody else in this

3  area at the time you were tased?  Can you --

4  A.   Kenneth Hollifield was holding the door.

5  Q.   Okay.  So Jailer Hollifield was there for the second

6  tasing?

7  A.   Yes, sir.

8  Q.   And I don't think I asked you, so I want to go back to

9  the first tasing of Barry White on May 10th of '22.  Other

10 than Barry White and yourself, was anybody else there at the

11 time you were tased?

12 A.   Yes, sir.  It was James Mosely and the officer named

13 Oscar Brewer, which no longer reside at Clarke County Jail.

14 Q.   How do you say Oscar's last name?

15 A.   I think it's Brewer.

16 Q.   With a "B" as in boy?

17 A.   Yes, sir.

18 Q.   Okay.  All right.  Have you told me all about the events

19 of the tasing of May the 26th of 2022 that form the basis of

20 your TRO?

21 A.   Yes, sir.

22 Q.   Okay.  And then you also mentioned -- in fairness to you,

23 you also mentioned there was no 24-hour medical care at Clarke

24 County, and I think you have told me about that.  Is there

25 anything else you need to tell me about that allegation that

1    you haven't told me already?

2    A.   Yes, sir.  There is no 24-hour medical.  When I state

3    that -- when I wrote about that, there has been times where I

4    have just out of nowhere have heartburn, and I asked to see

5    medical.  They'll give me a medical form and tell me to fill

6    it out, and I have to wait all the way until Thursday.

7         But there has been times where I have a rash pop up on

8    me, and I be like -- I will ask can I go see medical, and they

9    will give me a medical form, and I have to wait until

10   Thursday, maybe two weeks sometimes, to see medical.

11   Q.   But you did get to see it, but it was a week or two weeks

12   later?

13   A.   Yes, sir, prior.  And it's a man that come to the jail

14   named Windal.

15   Q.   Windal?

16   A.   Windal.

17   Q.   Does he come as a nurse practitioner or a medical doctor?

18   A.   He's is a medical doctor if I'm not mistaken.

19   Q.   And he has provided you medicine for your eczema or

20   heartburn medicine or what have you?

21   A.   Yes, sir.

22   Q.   Now, all of the events that you told me about, the tasing

23   and the macing, and the threaten that you deserve to be shot

24   and killed, all of those events, with the exception of the

25   bribing, which we're going to talk about in a minute, all of

1    those events, with the exception of the bribing, they occurred

2    prior to August of '22; is that right?

3    A.    August of '22?  When you say that --

4    Q.    May is before August.

5    A.    Yes, sir.

6    Q.    All right.  And so the only events that you're

7    complaining about to me -- and I want to make sure I

8    understand -- the only events that you're complaining about to

9    me that form the basis of your TRO that occurred after August

10   the 22nd was when you're alleging that Jailer Hollifield

11   attempted to bribe other inmates to jump you; is that right?

12   A.    That's not the -- yes, sir.  That's not the only event

13   that I'm complaining about, though.

14   Q.    No, no, no.  I just want to make sure -- I'm using August

15   of '22 as a dividing line, and you told me about the tasing

16   and the macing and you deserved to be shot and killed.  That

17   occurred before August.  And then the only event after August

18   was the one you told me about in January of '23 where Jailer

19   Hollifield attempt to bribe other inmates to jump you.  That

20   occurred in January of '23.  Am I correct about that?

21   A.    Yes, sir.

22   Q.    Okay.  Now, did you overhear Jailer Hollifield attempt to

23   bribe other inmates to jump you?

24   A.    I saw him when he waved up -- when they were handing out

25   lunch, I saw him when he waved up the food, and he nodded his

1    head at me, and he was motioning his lips.  He was whispering,

2    but I couldn't really hear.  I was turned sideways.  I was,

3    like, this way (indicating) looking back.

4    Q.   So you're seeing him motioning or communicating with

5    other inmates?

6    A.   Yes, sir.  And I asked the inmates what he said after

7    they left, and they said, he tried to bribe us to jump on you.

8    Q.   And who were those other inmates?

9    A.   It was a dude -- Anthony.  His name Anthony.  I don't

10   know his last name.  Anthony -- I think it's Anthony

11   Robertson.

12   Q.   Anthony Robertson?

13   A.   Anthony Robertson.  He go by Tony.  And a dude named

14   Michael White.  I got their signatures.  I wrote it up, and I

15   sent it to you.

16   Q.   All right.  And when did you first communicate to them --

17   when did you get a chance or when did they start talking to

18   you about what Jailer Hollifield did?

19   A.   They told me that right after he left the cell.  I asked

20   them right after he left the cell.

21   Q.   All right.  What did he offer them?

22   A.   He offered them, I guess, extra lunch, extra bags of

23   chips or stuff like that.  At the time, they wasn't making

24   commissary, so I assume that's what he tried to offer them.

25   Q.   When you say you assume, what did they tell you, if

1  anything?

2  A.   They told me he tried to offer them my lunch and

3  commissary -- well, my lunch and chips and such.

4  Q.   Do you know why Officer Hollifield would want you to be

5  jumped by these other inmates?

6  A.   Me and Officer Hollifield have had run-ins before that

7  previously.

8  Q.   All right.  Well --

9  A.   Just minor disagreements.

10  Q.   About what?

11  A.   About the lawsuit.  He would walk by and tell me, you

12  know you gone lose, right?  Me and Barry been talking.  You

13  know you gone lose.  Or he'll try to provoke me.  I asked for

14  some tissue.  He be, like, you always need something or --

15  Q.   You filed your lawsuit in July of '22 according to the

16  docket sheet.  All right?

17  A.   Yes, sir.

18  Q.   And you sued -- you haven't sued Officer Hollifield, have

19  you?

20  A.   No, sir.

21  Q.   Okay.  All right.  So the basis of your TRO is that he

22  attempted to bribe other inmates to jump you in January of

23  '23, even though he wasn't a defendant in your lawsuit?

24  A.   Yes, sir.

25  Q.   Is that correct?

1    A.    Yes, sir.  I didn't know how to go about adding him back

2    in my lawsuit.  It was another guy that helped me fill it out.

3    His name was Kelly Paul Brown.

4    Q.    Mr. Brown?

5    A.    Yes, sir.

6    Q.    Okay.  He helped you fill out your lawsuit?

7    A.    Yes, sir.

8    Q.    All right.  Anybody else?

9    A.    Just him.

10   Q.    Okay.  Are there any other basis that we have not

11   discussed, Mr. Ross, that support your motion for TRO?

12   A.    Also, there is -- I wrote about they have no law library.

13   Also, the jail is not -- if I'm not mistaken, I don't know

14   what it's up to part (sic) to the living environment, but I

15   know some cells only have hot water in the --

16   Q.    And we're going to get that in a minute, but I want to

17   make sure I keep it clear on this.  I'm going to talk about

18   your other claims in a minute.  Right now I only want to talk

19   about what's the basis of the TRO.

20   A.    That's it, sir.

21   Q.    Have you told me everything about the basis for your TRO?

22   A.    Also, it was one day they placed me in the hole.  It was

23   me and a guy named Michael Tillman.  They said we was smoking

24   in the cell, but when they came in, I was locked behind my

25   gate.  And they never found no form of a lighter, no form of

1    tobacco, no form of any type of substance of smoke that you

2    can use to smoke anything with.  And they placed us in the

3    hole.  They stripped me, did a strip search and found nothing.

4    And I believe that was retaliation of me having this lawsuit

5    against them.

6    Q.   When did that occur?

7    A.   The month and the date, I'm not really sure.  It's been a

8    while.

9    Q.   How long ago?

10   A.   I say -- two, maybe four -- four to two or three months.

11   I'm not sure.

12   Q.   Okay.

13   A.   I don't want to lie, so I'm not sure.

14   Q.   Who placed you in the hole?

15   A.   It was Oscar Brewer.  Oscar Brewer.  And there were some

16   more officers.  The date of it happening, it's been so much

17   going on recently, I'm not sure.

18   Q.   Were you written up for it?

19   A.   They took my commissary and visit.  They made me send all

20   of my papers home, like, envelopes, stamps, everything home.

21   Only thing they would allow me to keep was my legal mail.

22   Q.   Am I correct in assuming then if some disciplinary action

23   was taken against you, there would be some paperwork?  You

24   would have had a hearing or some type of -- some disciplinary

25   write-up?

1  A.   They don't give disciplinary write-ups.  They don't give

2  us no action about -- when they take stuff from us, we have to

3  buzz up there and ask how long it's taking.  Sometimes they

4  don't even want to tell us how long it's taking.

5  Q.   They don't give you any paperwork?

6  A.   No, sir.

7  Q.   Okay.  All right.  So since you filed your TRO in August

8  of '22, what, specifically, if anything, has happened that you

9  contend placed you in fear for your life?

10  A.   Since what's placed me in fear for my life --

11  Q.   Since August of '22.

12  A.   People trying -- Kenneth Hollifield trying to bribe

13  people to jump on me.

14  Q.   Right.

15  A.   I been in fear for my life ever since I been tased while

16  I'm locked and contained.  I feel like if you will do it once,

17  you will do it again.  I fear that that can happen again, and

18  maybe this time they might tase me and actually damage me.

19  Q.   Has anybody tased you since August of '22?

20  A.   No, sir.

21  Q.   Have any inmates jumped you, or have you gotten in

22  altercations with any inmates since August of '22?

23  A.   No, sir.  When you mean altercations, you mean with

24  inmates or officers?

25  Q.   Either.

```
 1   A.   I had an altercation with Officer Hollifield.  I asked
 2   him to sharpen my pencils, because I wanted to write the court
 3   district to see when is my -- about an omnibus hearing.  I had
 4   asked don't dismiss my case because of my lack of education if
 5   I'm not mistaken what I wrote.
 6        And he sharpened my pencil, but he had came back when he
 7   had sharpened the pencil, and I did not tie the trash up and
 8   hand it -- put it at the door.  I was on the phone at the time
 9   with my mother.  And he broke the pencils and said, if you
10   want me to do something for you, you can do something for me.
11   You could tie the trash -- you could tie the trash up and put
12   it at the door.  And walked off and threw the pencils at me.
13   Q.   All right.  Any altercations, other than that, after
14   August of '22?
15   A.   No, sir.
16   Q.   Okay.  One minute, Mr. Ross.
17   A.   Yes, sir.
18   Q.   Mr. Ross, you did mention, in fact, I think on May the
19   10th of '22, I believe that -- or May the 26th of '22, that
20   you had -- that you felt like you might want to commit
21   suicide?
22   A.   Yes, sir.
23   Q.   I think that was on May the 26th of '22 with Jailer
24   Mosely; is that right?
25   A.   Yes, sir.
```

```
 1   Q.   Have you had any suicidal ideations since?
 2   A.   After they placed me back in the cell, I tried to commit
 3   suicide the next day they placed me in the hole and --
 4   Q.   That would have been on May the 27th thereabouts?
 5   A.   Yes, sir.
 6   Q.   How did you attempt to commit suicide?
 7   A.   I tried to hang my shirt -- well, not my shirt -- my
 8   pants on top of the bars, and I tried to tie it around my
 9   neck, and I tried to jump.
10   Q.   Did somebody come in and stop it and rescue you?
11   A.   Yes, sir.  It was Officer Jackie and Officer Dice.
12   Q.   Okay.  Since that time, have you attempted to take your
13   own life?
14   A.   I think it was once more again after that.  They placed
15   me back in that cell, and I tried it again the same way.
16   Q.   And when was the second attempt?
17   A.   No, that was the first attempt.  That was before all of
18   this.  That was around about May -- May 24th I tried that.
19   That was the first attempt.  The second attempt was the
20   attempt I just previously mentioned.
21   Q.   Okay.  So you haven't made any attempts to commit suicide
22   since May of '22?
23   A.   No, sir.
24   Q.   Have you ever requested any counseling or treatment for
25   these suicidal ideations or attempts?
```

1   A.   Yes, sir.  I requested -- I sent papers up to Ms. Sheila

2   and Mr. Barry White, and they balled it up.  The boys in my

3   cell told me, don't write them talking like that anymore.

4   They got me evaluated recently, and I told the woman about the

5   problems that I have with suicidal problems.

6   Q.   Who is that woman?

7   A.   She from Weems.  I previously get a check for ADHD and

8   bipolar.

9   Q.   You get a check?  A medical check?

10  A.   Yes, sir.  For ADHD and bipolar.

11  Q.   Are you taking any medication for those conditions?

12  A.   At the jail they -- Mr. Windal, the -- I don't know if to

13  call him a nurse practitioner, but the man that come on some

14  Thursdays, he's treating me right now with Abilify and some

15  other pill.  But it's really not helping.

16  Q.   Have you told him that?

17  A.   I told him that that was the issue of him trying to get

18  me evaluated, so they can get me better help.

19  Q.   So you asked for an evaluation?

20  A.   Yes, sir, to get better help.

21  Q.   Did you tell him the medication he was giving you was not

22  working in your opinion?

23  A.   Yes, sir.

24  Q.   Did he seem responsive to your statement?

25  A.   Yes, sir, somewhat.

1   Q.   Okay.  So you're getting some treatment for those

2   conditions to help you with any potential suicide issues as

3   well?

4   A.   When you say that treatment, you just mean medicine-wise?

5   Q.   No.  You're getting some medicine, and you told him you

6   wanted some treatment, and he's looking into getting you

7   evaluated.

8   A.   Yeah, they got me evaluated.  But since then, haven't no

9   further steps has been took.

10   Q.   Okay.  Do you feel like you're okay now?

11   A.   No, sir.

12   Q.   But you haven't attempted to take your life since May,

13   right?

14   A.   No, sir.  Previously, I've been trying something new

15   called journaling.  My mother gave me the idea about writing

16   my -- writing my -- expressing my feelings that way.

17   Q.   Journaling.  Okay.  All right.  Have we discussed

18   everything that I need to know, in your opinion, about your

19   motion for TRO?

20   A.   Yes, sir.

21   Q.   And you're asking the Court to move you to a different

22   facility, or make it such that you are not in fear for your

23   life.  Now, are you telling me that you are scared that Barry

24   White, James Mosely and/or Kenneth Hollifield might harm you?

25   A.   Or any other officer, such as --

1   Q.   You haven't told me about any other officers.  What other

2   officers do you think might harm you?  Because you haven't

3   told me about them.  And what's the basis of them harming you?

4   A.   It ain't no basis of them harming me, but I feel as if

5   they might do it off a direct order of their boss Barry White.

6   Q.   All right.  Barry White, James Mosely, Kenneth

7   Hollifield, all three still work at the jail?

8   A.   Yes, sir.

9   Q.   Do you still interact with them on a daily basis?

10   A.   The officer that drove me up here, one of them is James

11   Mosely.

12   Q.   He's in the courtroom?

13   A.   Yes, sir.

14   Q.   All right.  Which one is he?  Is this Officer Mosely

15   there?

16   A.   (Indicating).

17   Q.   Okay.  And did you have any words with Officer Mosely on

18   the way here?

19   A.   No, sir.  I hardly spoke.  Only thing I asked was to use

20   the bathroom once I got here, and they told me yes.

21   Q.   And so since May 26th of '22, has Officer Mosely -- has

22   he threatened you, has he done anything to physically assault

23   you?

24   A.   No, sir.  I just --

25   Q.   Would the same be true of Barry White?

1    A.    With Barry White, my phone -- my phone wasn't working a

2    couple of days ago.  Hold on.  On February the 16th, Barry

3    White shut off all the phones.  Due to my phone wasn't

4    working, which I believe that is corporate (sic) punishment.

5    I asked him about our phone, because it wasn't working.  The

6    button -- the keypad wasn't working.  I asked him could we be

7    moved to another cell until our phones gets fixed.  He told

8    me, no, you in jail, deal with it.  And --

9    Q.    And that was a few days ago?

10   A.    Yes, sir.

11   Q.    Okay.

12   A.    And he told me he was going to handle me.

13   Q.    Has Mr. Hollifield done anything to place you in fear of

14   your life since, I guess, January '23?

15   A.    The recent -- the event that I spoke on when I asked him

16   to sharpen my pencil, and he threw them at me.

17   Q.    Well, did that place you in fear of your life, because he

18   broke the points of your pencil that you wanted to write and

19   threw them in your cell?  Did that place you in fear for your

20   life, Mr. Ross?

21   A.    No, sir.  He threw them at me, and that's what made me

22   kind of fear.  As if he would throw something at me, it might

23   go -- out of anger, he might make another action.

24   Q.    Prior to him throwing the pencils at you and the

25   attempted bribing, Mr. Hollifield has not done anything to put

1   you in fear for your life; is that a fair statement?

2   A.   Yes, sir.

3   Q.   All right.  Now, let's talk about your other claims.  All

4   right?  And I think you've got several, so bear with me.

5   You've got the excessive force claim, which I assume relates

6   to the tasing and the macing; is that right?

7   A.   Yes, sir.

8   Q.   Is there anything that you haven't already told me, that

9   is, forms the basis of your excessive force claim?

10  A.   No, sir.

11  Q.   So you've told me all about your excessive force claim?

12  A.   Yes, sir.

13  Q.   Okay.  On your excessive force claim, I want to make sure

14  I understand about your damages and your injuries.  Obviously,

15  you got tased, and the prongs stuck in you, right?

16  A.   Yes, sir.

17  Q.   Okay.  Did you get any medical treatment for that?

18  A.   Never.

19  Q.   Okay.  And obviously, you got maced, and you told me how

20  you used water to get it out and that reactivated it, and you

21  didn't get any medical treatment for that?

22  A.   No, sir.

23  Q.   And I assume it's an irritant to your eyes, right?

24  A.   Yes, sir.

25  Q.   Anywhere else?

1  A.   It got on my clothes, which got on my skin, and it

2  damaged --

3  Q.   What happens when it gets on your skin, the mace?

4  A.   It flares me up.  It breaks me out very bad.  It's like a

5  burning sensation.  It's kind of -- words can't really explain

6  how it feel.  It hurts me to lay on my left side at times.

7  Q.   And when did those issues -- how long did that last after

8  you were tased?  A few days?

9  A.   Weeks at times.  Weeks.  Because my skin is very

10  sensitive.  It took a long time for it to heal.

11  Q.   Did you ask for any medical treatment on Thursdays when

12  it came?

13  A.   They gave me -- I asked -- I asked for medical attention.

14  They gave me a medical form, and I filled it out.  It took

15  about a week or two for me to -- I think it was a week to a

16  week -- a week or maybe two for me to get medical attention.

17  Once I got medical attention, he prescribed me eczema cream

18  and cream for a rash.

19  Q.   And that helped?

20  A.   Yes, sir.

21  Q.   Windal?

22  A.   Yes, sir.

23  Q.   So it would have been a week, two weeks, whenever

24  Windal -- you got to see Windal?

25  A.   Yes, sir.

1   Q.   But a week or two-week window?

2   A.   Yes, sir.

3   Q.   And they gave you the eczema cream for the irritant on

4   your skin from the mace?

5   A.   Yes, sir.

6   Q.   Have you suffered any other injuries from the tasing or

7   the macing that we've not already discussed?

8   A.   Not -- lately, my -- I have muscles that be jumping a lot

9   in my body, in my lower back and in my chest at times.

10   Q.   Okay.

11   A.   Sharp pains, headaches, and stuff like that.

12   Q.   Have you told Windal or somebody in medical about these

13   issues?

14   A.   Truth be told, I fear to really complain about too much,

15   because they treat me for a lot right now with my mental

16   disability and the eczema.  I kind of fear --

17   Q.   So you haven't told Windal about these issues?

18   A.   I told him about the headaches.

19   Q.   Okay.  Did he tell you that was because you got tased or

20   maced?

21   A.   He couldn't really gave me no answer.

22   Q.   All right.

23   A.   He just prescribed me ibuprofen.

24   Q.   Have we discussed all of your -- all of your injuries

25   related to the macing and the tasing?

```
1    A.   Yes, sir.

2    Q.   Did you have a history of mental illness, bipolar, and

     ADD prior to being incarcerated at Clarke County, Mr. Ross?

3

4    A.   Yes, sir.

5    Q.   Did you ever receive any treatment for those conditions

6    prior to being incarcerated?

7    A.   No, sir.  Not recently.  I was taking care of my mother,

8    which had cancer at the time.

9    Q.   But you were diagnosed with those conditions prior to

10   going into Clarke County?

11   A.   Yes, sir.  I was diagnosed, and I receive a disability

12   check for that.

13   Q.   Okay.  How long had you been receiving that disability

14   check prior to these events?

15   A.   Since the age of five-years-old.

16   Q.   Since you were five?

17   A.   Yes, sir.

18   Q.   You were on disability for these?

19   A.   Yes, sir.

20   Q.   And how old are you, Mr. Ross?

21   A.   19.

22   Q.   Now, another claim that you have is no access to a law

23   library.

24   A.   Yes, sir.

25   Q.   Are you claiming that you should be entitled to walk into
```

1  a law library with books or a computer and research your case

2  whenever you want?

3  A.   No, sir.  I just would, like -- at times, I don't know

4  the sections for the things that I want, so I asked for

5  certain sections.  I'll write it on paper, and send it up

6  there, but they might give it to me, they might not.  They

7  might print it -- they might print me something out, they

8  might not.  It just depend on how they feel at the day or the

9  time, but they do give it to me at times, but I be wanting

10  more things.

11     And I have to -- sometimes if I ask for it, they won't

12  give it to me.  Sometimes they'll give it to me.  They won't

13  allow me the books.  I was asking for the books, so I can look

14  more in depth instead of them having to do certain things.  I

15  wouldn't mind being placed in the hole to be able to actually

16  use the book.  If it's damaged, I will pay for it.

17  Q.   Well, but what you're telling me is, and what I think

18  happens is, and you correct me if I'm wrong, you write down

19  what it is you want or the issue you want researched, and

20  somebody, I guess a paralegal or somebody, they'll go research

21  it and provide materials back to you, responsive to your

22  request; is that right?

23  A.   Yes, sir.  But they don't always give me my request.

24  Sometimes I have to -- sometimes I won't get it at all.  Like,

25  I asked recently for the sections of manslaughter.  I sent it

1  up there by Kenneth Hollifield.  I was not granted that back.

2  I asked for --

3  Q.   You wanted the code for manslaughter in Mississippi?

4  A.   Yes, sir, the code.  And I wanted the sections, and I

5  wanted her to print me out sections within that, but she

6  wouldn't -- she wouldn't give it to me.  She didn't deny it on

7  the speaker or nothing like that.  I just never received it.

8  Maybe she was busy or something.  That's why I felt as if -- I

9  know other facilities allow you to have books.  The only book

10  I would -- if they would allow my mother to bring me a book, I

11  will purchase my own law book.  But they only allow us to have

12  the Bible, and that's the only book we're allowed to read.

13  Q.   What other facilities let you have possession of a law

14  books?

15  A.   Books in the --

16  Q.   Law books.  What other facility, if you say, I want to

17  look at this code section, brings you the code book and gives

18  it to you to review at your leisure?  What other facility?

19  A.    If I'm not mistaken, Waynesboro, Mississippi used to be a

20  regional facility.  They do it if I'm not mistaken.

21  Q.   Have you ever been in Waynesboro facility?

22  A.   No, sir, but I have relatives that have.

23  Q.   Any other facts that give rise or support your no access

24  to the law library claim?

25  A.   No, sir.

1  Q.  Who is the individual you give your research assignment

2  to?  I think it was a she.

3  A.  Sheila Johnson.

4  Q.  Sheila Johnson.  Okay.  Now, you're also suing because

5  you have no access to regular media, and you're complaining

6  that you only receive a newspaper once a week; is that

7  correct?

8  A.  Yes, sir.

9  Q.  What newspaper do you get once a week?

10 A.  We don't get a local news -- we get a local newspaper

11 from Clarke County, not a global.  So we know (sic) what's

12 going on in the world.  We only know what's going on in Clarke

13 County.  We only get that on Thursdays.  Some Thursdays --

14 Q.  How many times is that printed a week?  Do you know?

15 A.  Once a week.

16 Q.  Okay.  So you get that weekly paper, but you're saying

17 you want to have one, like, a -- I don't even know if they

18 make it anymore -- *USA Today* or something like that, a

19 national newspaper?

20 A.  Or maybe just -- you know, they don't have no TVs in the

21 jail, so we don't know the news.  We don't know the forecast

22 or nothing.

23 Q.  All right.  And then you're also claiming -- suing

24 because you have no sunlight in your cell because of metal

25 plates over the windows.  So am I correct that you're getting

1    sunlight, you don't get direct sunlight, because there's a
2    metal plate over the window?
3    A.   We get no sunlight in the cell.  There is no window in
4    the cell, so you can see -- there's no sunlight coming within
5    the cell.  Only time we get sunlight is when we go outside for
6    yard call.
7    Q.   Are there windows in your cell?
8    A.   No, sir.
9    Q.   So there's no windows that are covered with plates?
10   A.   There's windows that's covered with plates, but they
11   ain't -- you can't see out of it.
12   Q.   And no light comes through -- comes around the edges or
13   anything?
14   A.   No, sir.
15   Q.   And are you allowed outside of your cell an hour or two a
16   day?
17   A.   We get an hour every day sometimes when they feel like
18   it, or when they're not too busy.
19   Q.   And you're allowed to go outside to have a rec yard or
20   some area where you can go outside for fresh air one hour a
21   day?
22   A.   Yes, sir.
23   Q.   Anything else you feel I need to know about that claim,
24   or have we discussed it in full?
25   A.   No, sir.

1   Q.   Okay.  Mold in the showers.  So you have a shower in your

2   cell, right?

3   A.   Yes, sir.  I sent some mold, if I'm not mistaken, to the

4   court district.

5   Q.   You're in the cell by yourself?

6   A.   I'm in an eight-man cell now.

7   Q.   Eight-man cell.  And when were you moved from a one-man

8   cell to an eight-man cell?

9   A.   I don't know the direct date, but if I'm not mistaken, it

10  was January-ish.

11  Q.   Of '23?

12  A.   Yes, sir.

13  Q.   Do they give you cleaning products periodically?

14  A.   To clean the cell?  When they first moved us in, no, sir,

15  not --

16  Q.   They don't give you any cleaning products once a month?

17  Any spray or scrub brush or rags or anything?

18  A.   They give it to us -- they give it to us every evening,

19  but the mold is so bad to the point where we spray it on

20  there, but it doesn't move.  It doesn't do no different.

21  Q.   So they give you cleaning products every evening, but

22  you're saying they're not effective?

23  A.   It's not effective, no, sir.

24  Q.   Okay.

25  A.   It done -- it's been there for so long to the point where

1   it's built up.

2   Q.   Okay.  You're also suing because you have infrequent

3   access to telephones.  I heard you mention that you have a

4   telephone in your cell or the area of your cell; is that

5   right?

6   A.   Yes, sir.  At times, Mr. Barry White shuts off the

7   phones.  If I'm not mistaken, I think that was May 26th he

8   shut the phone off for three to four days.

9   Q.   Okay.  But other than him deciding to shut it off for a

10  few days at a time, you've had access to a phone?

11  A.   Yes, sir.

12  Q.   Okay.  Anything else I need to know about that claim?

13  A.   No, sir.

14  Q.   Okay.  You're also alleging that you only receive two hot

15  meals per day, and the other meal is a sandwich and a bag of

16  chips, and that even the hot meals are not prepared to the

17  proper temperature.  And I recall reading in your complaint

18  that the meals are prepared off-site, and they're hot, but

19  they're not put in a hot box or some type of container to keep

20  them hot, so that by the time they get to you, they're not hot

21  enough.  Is that the basis of your complaint?

22  A.   Somewhat, sir.

23  Q.   Go ahead and tell me about it.

24  A.   The food is cooked at a restaurant.  The previous -- the

25  previous venue -- venuer, her name was Cozette.  That was the

1  name of the restaurant.  The food was cooked at her restaurant

2  and put in boxes -- in boxes and plates and brought through

3  the back door of the jail.  So when the food get there,

4  sometimes it's not -- it's not hot.  It's not warm.

5  Q.   Okay.  All right.  Anything else you need to tell me

6  about that?

7  A.   At times, I have been fed molded bread.  Officer

8  Hollifield was the officer that got my molded bread.  That's

9  the reason why the other venuer was -- what you call that --

10  terminated.  And I have been gave uncooked meat.  The new

11  venuer, he is better.  I will say that.  But the old, past

12  venuer was not.

13  Q.   So a previous provider of the food, they gave you molded

14  bread, and you complained.  And Officer White, Deputy White,

15  whatever, he fired that preparer?

16  A.   Not -- not directly.  She -- she had a 90-day extension.

17  Q.   Right.  But he stopped it --

18  A.   Later.

19  Q.   -- in part because of your complaint?

20  A.   Later to many more complaints, too.

21  Q.   Okay.  All right.  And now they have a new preparer, but

22  you're saying that food is not hot by the time it gets to you?

23  A.   Not all the time.

24  Q.   Sometimes it is, sometimes it's not?

25  A.   Sometimes it's warm, sometimes it's cold.

1   Q.   Okay.  Anything else you need to tell me about that

2   complaint?

3   A.   No, sir.

4   Q.   And then the other one is infrequent medical care or

5   denial of medical care all together.  I think we've discussed

6   that.  Is there anything else you need to add to that?

7   A.   No, sir.  Well, yes, sir.

8   Q.   Okay.

9   A.   There's no -- there is really not a person that is there

10  24 hours a day that is a nurse on hand, on standby.  The only

11  time that we get medical is when Windal come, and that's on

12  Thursdays, if you fill out a medical form, that's if he have

13  enough time, because he sees many people.  There's not a nurse

14  that's on standby.  So if you have an allergic reaction right

15  then and there, there's no nurse to treat that.  They have to

16  call the ambulance and the hospital, and the hospital from the

17  jail is a good little piece.

18  Q.   Okay.  Officers treating you with disrespect.  I know you

19  told me about the comments that Barry White made to you, that

20  you deserved to be shot and killed.

21       Anything else that officers told you that you show where

22  they've treated you with disrespect?

23  A.   No, sir.  That was the worst.  That was the worst one.

24  That's it.

25  Q.   And he told you you deserved to be shot and killed.  He

```
 1    didn't threaten to shoot and kill you, did he?
 2    A.   He said I -- he looked at me and told me I deserved to be
 3    shot and killed.  That's a verbal threat.
 4    Q.   All right.  Inmates drinking shower water because the
 5    sink only produces hot water.  What cell is that in?
 6    A.   That is in Cell 5, Cell C-1, Cell B-1.
 7    Q.   The cell that you're in now, does it have cold water?
 8    A.   The button works when it want to work, but most of the
 9    time, we have to push the button six to seven to eight times.
10    So we just go to the shower and get water.
11    Q.   Okay.
12    A.   They recently just fixed it before I came to court about
13    a week or two ago.  Before then, there was only hot water.
14    Q.   Now, is there a grievance process at Clarke County Jail?
15    A.   When you say grievance, what you mean, sir?
16    Q.   Well, when you came in, did they give you some type of
17    orientation -- they may not have given you a paper handbook,
18    but they'd point you to a kiosk or some type of digital
19    handbook and say, hey, look, these are the rules, if you have
20    a grievance that you're claiming, you know, you got mold in
21    your shower, you need to fill out this form or submit this
22    grievance on the kiosk, and then if it's denied, then you can
23    go to this next step.  Do you remember anything like that at
24    all?
25    A.   No, sir.  We don't even have kiosks in Clarke County
```

1    Jail.

2    Q.   And you don't have any grievance submittal forms?

3    A.   The only one that we have go to Barry White, but he --

4    when we complain, he tell us to deal it.

5    Q.   Okay.  When you say the only one you have, do you have

6    paper forms to submit grievances on the jail?

7    A.   Yes, sir.

8    Q.   All right.  Have you submitted grievances on that paper

9    form?

10   A.   I have tried to.  When I asked for it -- when I asked for

11   a grievance form, they won't bring it to me.  Barry White will

12   buzz in my cell ask me what do I want, what's my complaint,

13   and I'll tell him my complaint, and he'll tell me deal with

14   it.

15   Q.   Have you ever submitted a grievance form?

16   A.   No, sir.  At times, only thing I have complained about

17   was the mold at one point, but they never got back with me.

18   That was when I first got locked up.

19   Q.   So you haven't complained about anything other than the

20   mold in the shower?

21   A.   I complained about everything else, but not on the

22   grievance form.  When I requested the grievance form, it

23   wasn't given to me by Officer Ziller Kimber (phonetically).

24   Q.   But you have submitted a grievance form on the mold in

25   the shower?

```
 1    A.   Yes, sir.

 2    Q.   But you didn't submit grievance forms on the other items?

 3    A.   I did, but they wouldn't give me the form.  So it was

 4    verbally to the person who accept the grievance form.

 5    Q.   Okay.  So do you understand -- on the grievance in the

 6    shower, did they deny your grievance?

 7    A.   They just started spraying bleach on it, but it doesn't

 8    do no different.  It don't --

 9    Q.   They were responsive to that grievance, because they

10    started spraying bleach in the shower on the mold?

11    A.   I guess so, sir, yes, sir.

12    Q.   Okay.

13              THE COURT:  All right.  I appreciate your patience with

14        me, Mr. Ross.  And I'm going to allow Mr. White, I think it

15        is, to ask you any questions he may have at this time, and I

16        want you to be just as respectful and accommodating to him.

17        Okay?

18              MR. ROSS:  Yes, sir.

19              THE COURT:  Thank you.

20              MR. WHITE:  Thank you, Judge.  The Court's indulgence.

21        Would you prefer me to stand, sit?  I'll be brief.

22              THE COURT:  You can sit right there, and just speak

23        into the microphone.

24              MR. WHITE:  Thank you, Judge.

25
```

1                              **EXAMINATION**

2      **BY MR. WHITE:**

3      Q.   Mr. Ross, my name is Kevin white.  I represent the

4      defendants you have sued, Mr. Kemp, Mr. White, and Mr. Mosely.

5      Now, with regard to -- I'm going to go through some of these

6      things.  I just want to clarify some information real briefly.

7      A.   Yes, sir.

8      Q.   I thought I heard you testify that you've never submitted

9      a grievance form.  That's not true.  You've submitted

10     grievance forms, right?

11     A.   Yes, sir.

12     Q.   Okay.  I just want to make sure about that.  Do you

13     remember submitting a grievance form about maybe not sleeping

14     back in April of last year?  Do you remember that?

15     A.   Yes, sir.  It was due to them housing me around mental

16     patients that yelled, the one they had me around on May -- May

17     10th.

18     Q.   Okay.  And you submitted a form for that?

19     A.   May 26th, correction.

20     Q.   I'm sorry.  Go ahead.

21     A.   Yes, sir.  It was May 26th when I submitted that form --

22     not submitted that form, but it was around during that time or

23     a little before.

24     Q.   Okay.  And that would be one of -- you've submitted

25     grievance forms is my question; is that fair?

1  A.   Yes, sir, I believe so.

2  Q.   Okay.

3  A.   I believe so.

4  Q.   I think you also testified that -- in your complaint or

5  in your paperwork to the Court, you speak about the shower

6  water and inmates having to drink the shower water, because

7  the sink water is inadequate.  Did you testify the water in

8  your cell now is fine?

9  A.   Yes, sir.

10  Q.   Did they fix it?

11  A.   Yes, sir.  The button -- the button don't always work

12  directly, but we have to press it numerous times.  But at

13  times, it work.  At times, it don't.

14  Q.   Okay.  There's also you got some questions from the Court

15  about your medical care, and I just want to be clear about

16  this.  You have had opportunity to submit medical requests as

17  well, right?

18  A.   Yes, sir.

19  Q.   Okay.  And when you submit those requests, I think you

20  mentioned a Mr. Windal or maybe a nurse, but you get seen for

21  those; is that right?

22  A.   It's Mr. Windal.  But, yes, sir.

23  Q.   Okay.  I think you even stated that Mr. Windal got you on

24  some ADHD or some Abilify for the condition you have; is that

25  fair?

1   A.   Pretty much, yes, sir.

2   Q.   Okay.  Well, I don't want to put words in your mouth, so

3   if I'm wrong, tell me.

4   A.   Can you repeat that, sir?

5   Q.   Absolutely.  I thought I understood that since you've

6   been at Clarke County you have been put on Abilify; is that

7   right?

8   A.   Yes, sir.

9   Q.   Okay.  And that was in response to a request to get some

10  medical attention to the jail, right?

11  A.   That was before, but, yes, sir.

12  Q.   Okay.  Before what?  What do you mean?

13  A.   Before I had made a medical form about my eczema and I

14  spoke to Mr. Windal about my mental -- my mental problems.

15  And he placed me on meds prior before that.

16  Q.   Okay.  So the medical care with regard to the Abilify,

17  you're saying was in response to a verbal complaint to

18  Mr. Windal?

19  A.   Yes, sir.

20  Q.   Okay.  But Mr. Windal was there at that time to respond

21  to your medical complaint about the eczema?

22  A.   Yes, sir.  Because I had already been complaining to

23  Mr. Barry at the time, but that was verbal complaints.  I

24  never complained on paper.

25  Q.   Okay.  That's a fair response, and that's what I am

1    asking.  When you've made medical complaints on paper, you get

2    seen eventually, right?

3    A.    Eventually.

4    Q.    Okay.  With regard to your meals, do you know -- and I'm

5    just a little confused about this.  You said -- was it

6    Cozette?

7    A.    Yes, sir.

8    Q.    Is that who was doing it, or who is doing it?

9    A.    That's who was.

10   Q.    Okay.  Do you know who is doing it now?

11   A.    I believe a man named Skidmore.

12   Q.    Okay.  I think you said -- or the Court asked if it was

13   coming from a restaurant, and I thought you said, yeah, it

14   was.  But is that -- you know that, or you just heard that?

15   A.    I know that.  I was in Cell C-1.  I used to watch them

16   bring it through the back door.  Nowadays, I don't know if

17   they cook it at the jail or not.

18   Q.    Okay.

19   A.    Because I'm in an eight-man cell.

20   Q.    Okay.  What kind of -- what kind of food have you been

21   getting recently from the restaurant?

22   A.    Been decent food.  Good meals.

23   Q.    Okay.  Now, with regard to -- I mean, you mentioned an

24   issue about -- well, let's talk about the mold.  There's a lot

25   of testimony about that.  You haven't gotten sick from any

1    mold at the jail, have you?

2    A.   I have had a cold.  I had a cold a little while back, but

3    I treated it myself, because it wasn't that bad.  It was just

4    a bad head cold.

5    Q.   Okay.  That's fair.  And I want you to listen to my

6    question.  You got sick recently, right?  That's what you're

7    saying?

8    A.   That was about two or three weeks ago.  I drunk an

9    Alka-Seltzer.

10   Q.   Okay.  I think a lot of people had a cold about two or

11   three weeks ago, so that's fair.  Has anybody told you that

12   you've been sick because of mold in the jail?

13   A.   No, sir.

14   Q.   Okay.  So you're not aware of any, like, physical harm

15   you've sustained from the moldy conditions, right?

16   A.   No, sir.  But the mold is there.  I have sent some to the

17   court district.

18   Q.   Okay.  All right.  And I think you testified that y'all

19   get yard privileges, or you get outside every day?

20   A.   Not every day, but sometimes.

21   Q.   Okay.  When you do go, is it for an hour or two?

22   A.   One hour.

23   Q.   One hour?  Okay.  With regard to the complaint about the

24   windows being blacked out or blocked out, that's not made you

25   sick or anything, has it?

1   A.   What you mean made me sick?

2   Q.   Well, it's kind of a weird question.  But not having

3   sunlight in your room, you haven't suffered any physical --

4   or in your cell -- excuse me -- you haven't suffered any

5   physical injury from that?

6   A.   Lack of Vitamin C, yes, sir.

7   Q.   Okay.  All right.  Has anybody told you that?

8   A.   It's common sense if I'm not mistaken, sir.  No

9   disrespect, sir.

10  Q.   None taken.  None taken.  So I'm going to take that as

11  no, nobody's told you that, but that's common sense?

12  A.   Yes, sir.

13  Q.   Okay.  Now, you are in Clarke County Jail.  You said

14  you've been arrested for murder, but you have not been

15  indicted; is that right?

16  A.   Yes, sir.

17  Q.   Okay.  So you had an initial appearance, right?

18  A.   What you mean initial appearance, what that mean?

19  Q.   That's a fair question.  You've been to court.  Even

20  though you haven't been indicted, you have seen a court

21  because of this charge, right?

22  A.   Only for a bond, that's it.

23  Q.   That's exactly what I am talking about.  It would have

24  been a while ago, but you saw a judge, right?

25  A.   Yes, sir.

1  Q.   Okay.  And you had a lawyer with you at that time, didn't

2  you?

3  A.   Yes, sir.  But if I'm not -- no disrespect, but what that

4  have to do with this incident?

5  Q.   Well, the way this works is, and it may not seem fair,

6  but he asked you some questions, and then I get to ask you

7  some questions.

8  A.   Yes, sir.

9  Q.   So I would ask you just to kind of focus on the questions

10 I'm asking.  They may not seem relevant, but if you can, I

11 know it may be a little frustrating.

12 A.   Yes, sir.

13 Q.   Okay.  So -- yeah, that was my question.  You had a

14 lawyer with you when you went to court?

15 A.   Yes, sir.

16 Q.   Okay.  Do you remember his name?

17 A.   Edward Kramer.

18 Q.   Edward Kramer.  Okay.  And was he court-appointed?

19 A.   Yes, sir.

20 Q.   Okay.  When was the last time you saw Mr. Kramer?

21 A.   I can't really just put a direct date on that, so I won't

22 say.

23 Q.   Okay.  I'm going to try to help you narrow it down.  It

24 doesn't have to be exact.  Have you seen Mr. Kramer since

25 Christmas?

1   A.   Yes, sir.

2   Q.   You have.  Okay.  Did you see him between Labor Day and

3   Christmas?  Did you see him in the fall?

4   A.   Yes, sir.

5   Q.   Is that -- have you only been to court once?

6   A.   What you mean once, for a bond or --

7   Q.   Well, for anything on this charge.

8   A.   I done been to court twice.  No, not -- twice.

9   Q.   That's what I would think.  You went the first time and

10  then you would've gone back to try to get your bond.  Does

11  that sound about right?

12  A.   Yes, sir.

13  Q.   Okay.

14  A.   The reason of me not getting the bond, they say capital

15  has no bond.

16  Q.   And I think you testified that it's not -- maybe not the

17  best process you prefer, but you know how to submit a

18  grievance form.  You know how to submit a grievance form,

19  right?

20  A.   Yes, sir.  At times, I request to submit a grievance

21  form, but they won't allow it.

22  Q.   Okay.  I think that was a yes, you know how?

23  A.   Yes.

24  Q.   Okay.  That's fine.  And you have submitted grievance

25  forms since you've been in Clarke County?

1    A.    I believe so, yes.

2    Q.    You testified a long time about, which is fine, of the

3    May 10th and the May 26th incidents with Mr. White and

4    Mr. Mosely.  A couple of things I wanted to clarify.  Just for

5    my record, you testified that there was no way to request

6    medical after you were tased.  But then you later testified

7    that you were ultimately seen and given some skin cream after

8    you were tased.

9    A.    That was because -- that wasn't directly after I was

10   tased.  That was two to three weeks after.  I'm not going to

11   say three.  I'd say two.  But I asked for that myself.  I put

12   in a medical request myself.  It wasn't placed in by Mr. White

13   due to him knowing he tased me, or Mr. Mosely due to them

14   knowing they tased me.  It was done of my behalf.

15   Q.    That's what I'm asking.  You put in a medical request

16   because of complaints you were having after that, and you

17   eventually got seen and treated, right?

18   A.    Yes.

19   Q.    Okay.  And you did that?

20   A.    (Witness nods head.)

21   Q.    Is it -- and you were -- your testimony, I think, was

22   pretty honest.  And again, I'm not trying to put words in your

23   mouth.  Is it fair to say that -- let's start with the first

24   one, May 10th.  Okay?  So you had been in the jail about two

25   months at that time; is that fair?

1    A.    Yes, sir.

2    Q.    Okay.  Is it fair to say that during that incident you

3    were agitated?

4    A.    I wouldn't say I was agitated, but I would say at the

5    time I was just trying to get clarification.  I was asking a

6    question.  Not agitated.

7    Q.    Okay.  Well, I think you testified that at some point you

8    were yelling, and you hit the door, so is --

9    A.    I was yelling, like, such as, hey, officer.  Then I hit

10   the door, because it's many -- it's many inmates speaking at

11   one time during this.  You know, it is a jail.  No one is

12   quiet.

13   Q.    Okay.  Okay.  I think on the May 26th incident -- well,

14   actually, I'll go back to May 10th.  The only way you -- the

15   only knowledge you have that it was Officer White who tased

16   you on May 10 is you saw his glasses; is that right?

17   A.    I saw his face.  I know what Officer Barry White look

18   like.  If he was present today, I can point him out.  I know

19   that was him based off his glasses, but I saw his face.  I

20   know what he look like.

21   Q.    That's a fair response.  I'm just trying to clarify.  So

22   it wasn't just because of his glasses.  You actually saw the

23   man who tased you?

24   A.    I actually saw the man who tased me.  When I turned

25   around, I saw Mr. Barry with the TASER in his hand.

1  Q.   Okay.  And you testified earlier that you weren't moving

2  as he instructed you to at the time?

3  A.   Not at the time.  I was locked behind the gate when he

4  tased me.

5  Q.   Okay.

6  A.   But when they asked me to go behind my cell gate the

7  first time before they tased me, I did not move directly right

8  away.  But the second time he asked, I got up speedily and

9  moved.

10  Q.   Okay.  All right.  And you also said you called him a "B"

11  word, right?

12  A.   He called me a "B" word.  He called me an ignorant "B"

13  word.

14  Q.   Okay.  And at that point, you turned around and --

15  A.   Called him -- and I said, you one, too.  And he said,

16  what?  I called him the "B" word.

17  Q.   Okay.  And that's what I am getting at when I say during

18  all of this, you were agitated.  You know what I mean?

19  Like -- that's not fair?

20  A.   I wouldn't say I was agitated.  I was just -- if you

21  asked me a question, I will give you a response.  You got to

22  be -- when you say agitated, I wasn't in anger.  It wasn't a

23  reaction out of anger.  It was just the verbal response.  He

24  said something to me.  I said something back.  It's just like

25  a kid saying nah-nah boo-boo, and you say it back.

1  Q.  Okay.  All right.  Now, with regard to -- we'll go to the

2  May 26th, and then I'll be done I think.  You mentioned that

3  you had been suicidal around that time; is that right?

4  A.  Due to distress of lack of sleep by them housing around a

5  mental patient.  But it had just recently just got to that

6  point.

7  Q.  Okay.  So yes?

8  A.  We would just say yeah.  Yeah.

9  Q.  Okay.  So you were in your -- is it fair to say you were

10 in your cell, and you were making some sort of threat to kill

11 yourself?

12 A.  I wasn't making no threat to kill myself.  I was telling

13 him I feel as if I want to harm myself.  I didn't say I was

14 going to harm myself.  I said I feel as if it is getting to

15 that point to where I wanted to harm myself.  Can you please

16 get me some help is pretty much what I was referencing to.  I

17 wasn't making the threat saying I'm gone do it.  I said I feel

18 as if it's getting to that point.

19 Q.  Okay.  And you filed this lawsuit, right?

20 A.  There was a man that helped me file it named Kelly Paul

21 Brown.  I did not fill it out completely by myself.  I had

22 help.

23 Q.  Okay.  Well, we're here at --

24 A.  But I filed it if we gonna say that, yes, sir.

25 Q.  Okay.  We're here because it's something you intended to

1  happen.  Fair?

2  A.   What you mean something I --

3  Q.   We're here for you, for what you filed, right?

4  A.   Yes.

5  Q.   Or for what you caused to be filed; is that fair?

6  A.   Yes, sir.

7  Q.   Okay.  And with regard to this lawsuit, when the Court

8  sends you something in the mail, you've been receiving it,

9  right?

10  A.   Yes, sir.

11  Q.   Okay.  And the Court asked you about some motions that

12  you filed.  So you know the Court was getting the stuff you

13  sent in, right?

14  A.   Yes, sir.  I didn't file the motions.  Someone wrote them

15  up for me, and I just sent them.

16  Q.   Okay.  So whoever wrote them, you wanted them to get to

17  the Court.  My point is the Court got them, right?  Obviously?

18  A.   Yes, you are right.

19       MR. WHITE:  Okay.  Nothing further, Judge.

20       THE COURT:  A couple of follow-up.

21                    **CONTINUED EXAMINATION**

22  **BY THE COURT:**

23  Q.   And not to belabor the point, Mr. Ross, but you had a

24  history of bipolar and ADHD, I believe?

25  A.   Yes, sir.

1  Q.   Prior to your incarceration?

2  A.   Yes, sir.

3  Q.   And you've been receiving disability since the age of

4  five for those conditions?

5  A.   Yes, sir.

6  Q.   So the six months or a year prior to your incarceration,

7  were you taking any medication for those conditions?

8  A.   Six months to a year -- I would say a year.  I was a year

9  -- a couple of months before I was locked up.  I don't -- I

10  don't directly know when, but a couple of months I was taking

11  meds.  But I stopped going.  I think it was a couple of months

12  ago.  I was taking Adderall, a mood stabilizer if I'm not

13  mistaken.  That's what it is.

14  Q.   Do you remember the name of the mood stabilizer that you

15  were taking?

16  A.   Adderall, yes, sir.

17  Q.   Were you taking any other medications?

18  A.   I don't -- I don't -- what happen, so --

19  Q.   And it was a poorly worded question, and I admit it.

20  Even judges make poorly worded questions.  So let me ask it a

21  different way.  Is it a fair statement that just prior to your

22  incarceration in Clarke County Jail you weren't taking any

23  medications for your mental illness?

24  A.   No, sir.  At the time, I had so much going on with taking

25  care of my mother, which who had cancer, she had throat cancer

1    recently.  She had it cut out.

2    Q.   All right.  So you weren't taking them because events

3    with your momma's heath, right?

4    A.   I wasn't able to make appointments.

5    Q.   Gotcha.  Were you taking -- when -- because you testified

6    that you got Abilify at some point.  How long were you in the

7    jail at Clarke County before you started receiving medication

8    for your mental illness?

9    A.   I would want to say about a month or two.  A month to

10   two, so maybe three.

11   Q.   All right.  That's a pretty good span, a month or two or

12   three.  Were you taking any medications for your mental

13   illness that we've talked about in May of '22?

14   A.   I'm not sure.  But I don't want to give a direct answer,

15   because I'm not sure.

16   Q.   Okay.  You're not sure if you were?

17   A.   I'm not sure if I were.

18   Q.   Okay.  But once you started getting medication, it was

19   Abilify.  Was it anything else?

20   A.   He have tried me on five different medicines.  But every

21   time I go see him, I will tell him whether they were working

22   or not or whether they were helping or not.

23   Q.   And he would change it or give you a different one, and

24   now you're on Abilify?

25   A.   Yes, sir.

1  Q.   And Abilify, I understand, is helping you, you think?

2  A.   I wouldn't say that, but it's --

3  Q.   You are not getting any benefit from it, you don't think?

4  A.   No, sir.  That's why I asked to be evaluated to get

5  better help, go to a Weems Center to get evaluated, so they

6  can treat me properly.

7  Q.   What is the Weems Center?

8  A.   Weems is like Brentwood say for instance, where they put

9  you on medicine.  It's not -- they don't -- it's not an

10  inpatient facility.  It's an outpatient where they take you

11  there, and they ask you what's going on with you, like,

12  whether you're seeing voices, or hearing things or seeing

13  things.

14  Q.   You've been there before?

15  A.   Yes, sir, once, when I was younger.

16        THE COURT:  Okay.  Okay.  Thank you, Mr. Ross.  All

17     right.  So here's what we're going to do.  We're going to

18     enter a scheduling order.  All right?  And, Mr. Ross, what

19     that's going to do is, I'm going to allow the parties,

20     including you and Mr. White on behalf of the defendants, to

21     conduct discovery under the rules.

22        And so I'm going to give you 90 days.  I'm going to

23     give the parties 90 days to conduct discovery.  So all

24     discovery will need to be completed before May the 23rd of

25     '23.  So any discovery that you want to conduct in

 1     accordance with the rules will need to be completed by

 2     May 23rd of '23.

 3          Then I'm going to give you 21 days after the expiration

 4     of discovery deadline to file any dispositive motions.  So

 5     any dispositive motions will need to be filed on or before

 6     June the 13th of '23.  Okay?  And you're going to need to

 7     read up on the rules, because you're representing yourself,

 8     to conduct discovery.  All right?

 9          MR. ROSS:  Pardon me, sir.  What is discovery?

10          THE COURT:  Well, and I can't be your lawyer, because I

11     am the judge.  I can't wear two hats.  All right?

12          MR. ROSS:  Yes, sir.

13          THE COURT:  And you are proceeding pro se in this

14     matter.  But essentially -- and Mr. White, correct me if I'm

15     wrong, you can write questions to the defendants, and they

16     answer those questions under oath as long as they're

17     relevant to this litigation.  And that's called an

18     interrogatory.  It's a fancy word for question.  But it has

19     to relate to this case.  And then you can request documents

20     or other materials.  So if you want to request some

21     documents or materials, that's called a request for

22     production, and you have to specify what type of documents

23     or copies, and they give you copies as long as it complies

24     with the rules.

25          I suspect strongly that Mr. White is going to send you

1    interrogatories and request production of documents, and so

2    you will see what those are like very shortly when he sends

3    you copies of his discovery.  Okay?  So you have the

4    opportunity to conduct discovery or any other means of

5    discovery in accord with the rules, which you need to have

6    all of that done by May the 23rd.  Okay?

7         And, Mr. White, do you have any pre-discovery

8    disclosures that you need to give to Mr. Ross today?

9         MR. ROSS:  I do, Your Honor.

10        THE COURT:  Would you identify those for the record?

11   And if they're Bates stamped, I want you to identify them by

12   Bates stamp.

13        MR. WHITE:  Yes.  They're Bates stamped Ross 000003

14   through 000042.

15        THE COURT:  And I was distracted for a minute because

16   of my own -- what are those documents?

17        MR. WHITE:  It's a jail file, Judge.

18        THE COURT:  His jail file.  And does it have copies of

19   any grievance, any medical records that are pertinent?

20        MR. WHITE:  No medical records.  Well, that's not true,

21   Judge.  It has grievances.  It has medical complaints.  And

22   there is also a log of medicine, prescription medicine that

23   he was given, when it was received, the type of medication,

24   so records to that extent.  And then there were some other

25   mentions about the aforementioned Mr. Windal and his reports

1    after visits he had with Mr. Ross.  So not a full set of

2    medicals, Judge, but some things that are in there.

3         THE COURT:  Are there any reports regarding the tasing

4    or macing incidents?

5         MR. WHITE:  There are not, Your Honor.

6         THE COURT:  Do any such reports exist?

7         MR. WHITE:  I am not aware of them, Judge.

8         THE COURT:  All right.  Mr. Ross, he has to provide you

9    with those records in accordance with the rules.  Those are

10   called prediscovery disclosures, and so he's going to give

11   them to you, I guess, today, or are you going to mail them

12   to him?  Whichever.

13        MR. WHITE:  I can give them to him today, Judge.  I

14   have a copy for him if you'd like, or I can mail them to

15   him, whatever your preference.

16        THE COURT:  All right.  The other thing, Mr. Ross, and

17   it's very important, so I want to make sure that you listen

18   closely.  You have to keep the Court, the Court Clerk

19   advised of your mailing address at all times.  I want to

20   make sure that you are getting the mailings.  Because if we

21   set another hearing or we require a response, and you don't

22   comply with the date that response is due, then it could

23   subject your case to dismissal.  So you need to keep the

24   Court aware any time there is a change of address.  You need

25   to keep the Court aware of your address.

1          MR. ROSS:  Yes, sir.

2          THE COURT:  That's very important, Mr. Ross.  Do you

3    have any questions of the Court, Mr. Ross, at this time?

4          MR. ROSS:  No, sir.

5          THE COURT:  Mr. White?

6          MR. WHITE:  No, Your Honor.

7          THE COURT:  All right.  Well, having said that, we will

8    close the record on this matter, and the parties are free to

9    go.  I think we have another omnibus hearing that we will

10   conduct shortly.  The Court will stand in recess for about

11   ten minutes.

12         No, apparently we're not.  Oh, the consent.  Mr. Ross,

13   you signed where I'm supposed to sign, and you're not

14   supposed to do that I'm told.  So we need to get another

15   consent to sign for you.  But we're going to check it, so

16   that you know where to sign it, and Mr. White is going to

17   have to sign again.  Okay?

18         MR. ROSS:  Yes, sir.  I'm sorry, sir.

19         THE COURT:  That's okay.  It could happen to me, too,

20   but I have somebody to tell me where to sign.  So don't

21   worry about it.

22   ****************************************************************

23

24

25

1                    **COURT REPORTER'S CERTIFICATE**

2

3          I, Caroline Morgan, Official Court Reporter for the

4    United States District Court for the Southern District of

5    Mississippi, do hereby certify that the above and foregoing

6    pages contain a full, true, and correct transcript of the

7    proceedings had in the forenamed case at the time and place

8    indicated, which proceedings were stenographically reported by

9    me to the best of my skill and ability.

10         I further certify that the transcript fees and format

11   comply with those prescribed by the Court and Judicial

12   Conference of the United States.

13         THIS, the 23rd day of March, 2023.

14

15                         /s/ Caroline Morgan, CCR

16                         Caroline Morgan, CCR #1957
                           Official Court Reporter
17                         United States District Court
                           Caroline_Morgan@mssd.uscourts.gov
18

19

20

21

22

23

24

25